**[Cite as *State v. Allen*, 2020-Ohio-4493.]**

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
LUCAS COUNTY

State of Ohio                                    Court of Appeals No. L-18-1191

     Appellee                                 Trial Court No. CR0201801184

v.

Lavelle Allen aka Lavell Allen            **DECISION AND JUDGMENT**

     Appellant                                Decided:  September 18, 2020

* * * * *

Julia R. Bates, Lucas County Prosecuting Attorney, and
Evy M. Jarrett, Assistant Prosecuting Attorney, for appellee.

Lawrence A. Gold, for appellant.

* * * * *

**SINGER, J.**

{¶ 1} This is an appeal by appellant, Lavelle Allen, from the September 11, 2018

judgment of the Lucas County Court of Common Pleas, after he was found guilty of two

counts of murder, each with a firearm specification.  At sentencing, the convictions

merged, and appellant was sentenced to 15 years to life in prison for the murder

conviction, and three years mandatory actual consecutive incarceration for the firearm specification. For the reasons that follow, we affirm the trial court's judgment.

Appellant sets forth two assignments of error:

I. The trial court abused its discretion in denying appellant's request for a jury instruction on the lesser included offense of voluntary manslaughter.

II. The jury's verdict was against the manifest weight of the evidence presented at trial.

**Facts**

{¶ 2} On January 18, 2018, appellant and some acquaintances were socializing, drinking and smoking in appellant's apartment at Moody Manor. A fight occurred between appellant and Larry "Rocky" Pendleton, and appellant shot and killed Rocky.

{¶ 3} On January 29, 2018, appellant was indicted on two counts of murder in violation of R.C. 2903.02(A), unclassified felonies. Each count included a firearm specification pursuant to R.C. 2941.145. Appellant pled not guilty.

{¶ 4} A jury trial commenced on August 27, 2018. After the presentation of testimony, evidence and arguments, the court gave the jury instructions, which included an instruction on self-defense. On August 31, 2018, the jury found appellant guilty, and on September 5, 2018, appellant was sentenced to prison. Appellant timely appealed.

2.

**Trial**

{¶ 5} At trial, the state presented the testimony of several witnesses; we will refer to some of the witnesses by their first names. Appellant testified in his own behalf. The relevant testimony is summarized below.

**Myisha Neal**

{¶ 6} Myisha testified she lived in Moody Manor on January 18, 2018, and knew appellant and Rocky because they used to hang out, along with Tyrone Jones. Rocky lived in Moody Manor in a basement apartment with his girlfriend, Peaches. Appellant also lived in Moody Manor, on the second floor, in apartment 313, which was in the same building as Rocky. Myisha lived across the parking lot from that building.

{¶ 7} Myisha knew appellant as James, and described him as the young kid in the crowd who was easily influenced. She was closer with Rocky than everybody else because they saw each other almost every day and he helped her by picking up her children at school. She described Rocky as a giving person, a great dad and helpful to others. She saw appellant and Rocky together at least every other day. Myisha, appellant and Rocky smoked weed together and appellant and Rocky drank beer almost every day for a time as none of them were working. She observed bickering between appellant and Rocky when they were drinking beer but never saw the men fight. Myisha never saw Rocky with a gun, nor did she see Tyrone with a gun, but did see appellant with an older gun.

3.

{¶ 8} Myisha testified Tyrone was 47 years old at the time of the shooting, and he was at the Moody Manor apartment with his girlfriend, Brittany, every night and day, but he did not spend the night because he had a wife who he would go home to. Brittany's apartment was directly below appellant's apartment. Tyrone was the big man on campus, a leader, bully and drug dealer, but he did not sell marijuana. Tyrone bought the beer, so everyone would tag along and follow him. Tyrone was an alcoholic who sat around all day drinking; he did not smoke marijuana. Myisha and Tyrone were "secretly texting and everything," but did not have a physical relationship.

{¶ 9} Myisha testified Rocky was hurt on the job and could not work. Rocky was different from Tyrone and appellant because Rocky wanted to work, so drinking all day was a temporary thing for Rocky.

{¶ 10} Myisha remembered January 18, 2018. Her children were with their father, so she cooked earlier in the day. Later in the day, she saw Tyrone and Rocky come out of appellant's apartment; they were going to get beer. Tyrone and Rocky were talking about appellant acting funny because appellant just got his first paycheck. Myisha invited Tyrone and Rocky to come to her apartment after they got beer, instead of going back to appellant's apartment. Tyrone said his girlfriend would not allow it. Tyrone also did not want Myisha to go up to appellant's apartment because his girlfriend would be able to hear Myisha. Rocky invited Myisha to come up to appellant's apartment to smoke a blunt; Myisha went to appellant's apartment. Appellant supplied the marijuana

4.

that night.  Myisha was not intoxicated as she smoked one blunt; she had been smoking marijuana since she was 15 years old.

{¶ 11} Myisha testified appellant was sitting on the couch, but Rocky refused to sit, saying he did not want to sit down.  Appellant asked Rocky to sit down because Rocky was making appellant nervous.  Although not a topic of conversation that night, Moody Manor had an infestation of bed bugs and Myisha said Rocky had stated before that he would not sit on people's furniture because of bed bugs.  A petty argument started when Rocky said appellant used to smoke with him, but now appellant was going to smoke with everyone else because appellant has a check.

{¶ 12} Myisha recalled that appellant left his apartment to get cigarettes, and when he returned, the argument between appellant and Rocky changed.  Appellant accused Rocky of peeing on his toilet seat one night when Rocky was drunk, which Rocky denied, and the argument continued back and forth.  Myisha said it was one petty argument after the other with the two men, and while they argued, she and Tyrone flirted with each other and laughed at appellant and Rocky.  The argument lasted for about 10-15 minutes, and "never got vicious, like I'll beat you up. * * * it stayed just a regular argument.  It's just now they were face-to-face. * * * They're right in each other's face."  By this time, the men were in the front room of the apartment.

{¶ 13} Myisha testified that as the men argued, appellant pulled his hands out of his pockets, and had brass knuckles on the fist of his one hand, and "he just takes off on Rocky's face and hitting him over and over again * * * Rocky didn't know what was

5.

coming." Glasses started breaking and the two men "fell all over." The men were now in the kitchen and Myisha was by the couch near the window. She told Tyrone that he had to break up the fight, so Tyrone grabbed appellant, and Rocky started hitting back. Myisha described Rocky as bleeding and his face was messed up, but he was still standing. Myisha said Rocky did not have brass knuckles at any time during the fight.

{¶ 14} Myisha testified when Tyrone separated the two men, Tyrone pushed Rocky by the front door and appellant by the bathroom in the hallway. Rocky was sideways in the corner and Tyrone was reaching for the doorknob to open the door so he and Rocky could get out of the apartment. Appellant then "pulls out the gun. Pow, pow, pow, pow." Myisha heard five gunshots. Appellant was the only person with a gun, and Rocky and appellant did not wrestle for the gun, according to Myisha.

{¶ 15} Myisha saw Rocky's body slide down into the corner, and she heard him say to Tyrone, "T, T, help me." Rocky's eyes rolled back in his head, Tyrone set Rocky down, because Tyrone had Rocky's arm, and Tyrone ran out of the apartment. Myisha followed because she thought appellant was going to shoot her and Tyrone in their backs. They ran into Tyrone's girlfriend, who was coming up the steps. Myisha called 911 while she was looking for Peaches' apartment. Myisha found Peaches' apartment and told her that appellant shot Rocky.

{¶ 16} The last time Myisha saw the gun, it was in appellant's hand, and no one entered his apartment while they were waiting for the police. The ambulance and

6.

detective arrived, and Myisha saw Rocky's body being brought down, and she knew he was gone. A detective took Myisha to the Safety Building.

**Bradley Knapp**

{¶ 17} Officer Knapp, of the Toledo Police Department, testified he was working the late shift on January 18, 2018, with his partner, Officer Adam Hobbs. At about 1:00 a.m., they were dispatched to Moody Manor to investigate a homicide. Officer Knapp was wearing a body camera, which was operational. The officers responded to apartment 313, found the door ajar, and announced themselves. Officer Knapp observed movements in the apartment so he tried to push the door open but it would not open all of the way and kept coming back at the officers. Finally the door was opened and Officer Knapp, covered by his partner, entered the apartment and encountered a man, with his hands up. Officer Knapp pulled the man out of the apartment and handcuffed him. The officer identified appellant as that man.

{¶ 18} While in the hallway, Officer Knapp noticed appellant was sweaty, and appellant mentioned he was in a fight and said it was "his gun." Officer Knapp understood appellant to mean the gun belonged to the decedent.

{¶ 19} After back-up crews arrived, Officers Knapp and Hobbs entered appellant's apartment and found the decedent propped up against the door, leaning on it. The apartment was clear, no one else was inside. Officer Knapp noticed gunshot wounds to the decedent's chest. The officer was present when the decedent was pronounced dead. Officer Knapp learned the decedent was Larry Pendleton (Rocky).

7.

**{¶ 20}** Officers Knapp and Hobbs were assigned to keep watch on appellant, and were then ordered to transport appellant to the detective bureau in the Safety Building. Prior to going downtown, Officer Knapp located brass knuckles on appellant, which were silver.

**{¶ 21}** Officer Knapp escorted appellant from the third floor of the apartment building, out the back door and down the sidewalk, where people had gathered including Rocky's girlfriend. Appellant said, "I'm sorry, Peaches, he had to go."

### Anthony Wrozek

**{¶ 22}** Officer Wrozek, of the Toledo Police Department, testified he was working on January 18, 2018, with his partner, Officer George Stauch. Right around 1:00 a.m., they received a call to assist with an investigation at the Moody Manor. They were the second or third unit on the scene, and Officers Knapp and Hobbs were placing someone in custody outside of apartment 313. Officer Wrozek and his partner helped to clear the apartment, finding only the decedent in the apartment.

**{¶ 23}** Officer Wrozek went down the stairs and outside to make sure nobody came into the building. There was a crowd of people, and the officer asked if anyone was inside when the event occurred. Four or five people pointed to a man who was walking away. Officer Wrozek walked towards the man, and said he wanted to talk. The man was walking briskly, but eventually stopped. Officer Wrozek asked the man if he had been inside when the event occurred; the man said no. The officer asked the man for his identification, then patted him down for weapons; none were found. The man produced

8.

his identification; it was Tyrone Jones. Tyrone then admitted to being inside when it happened. While outside, the officer did not conduct a search, but he scanned the area, and did not notice any weapons on the ground.

{¶ 24} Officer Wrozek walked Tyrone to the police car and placed him in the backseat. The officer contacted Sergeant Noonan, who commanded Officer Wrozek to bring Tyrone to the Safety Building to be interviewed; the officer complied.

**George Stauch**

{¶ 25} Officer Stauch, of the Toledo Police Department, testified he was working on January 18, 2018, with his partner, Officer Wrozek. They were dispatched around 1:00 a.m., to Moody Manor for a person shot, and were the second crew to respond. They went up to the third floor, where a person was detained in the hallway by the crew that was already there.

{¶ 26} Officer Stauch and his partner entered apartment 313, and had to push the door pretty hard to get inside; a body was against the door. They secured the apartment, after finding no one there, other than the decedent. Officer Stauch did a cursory look for a weapon, but found none. They then canvassed for witnesses, and began knocking on doors. Officer Stauch recalled someone saying the weapon may be in the basement, so he and Officer Wrozek headed downstairs.

{¶ 27} Officer Stauch testified a woman stuck her head out, and said she was in the apartment at the time of the shooting; it was Myisha Neal. Myisha was in Crystal Robinson's apartment. Officer Stauch stopped to talk with Myisha, and did not notice

9.

any weapons on her, but he did not search her. Myisha was detained, since she was a witness, and she was allowed to use her cell phone. At first, Myisha was pretty calm, but after she took some phones calls and described the events that had occurred, she was crying and seemed upset. Officer Stauch remained with Myisha for about 40 minutes, except for a few minutes when he left her to give the detectives information for the investigation and to get transportation for Myisha to the Safety Building. Myisha told Officer Stauch that appellant was the shooter.

**Laurie Renz**

{¶ 28} Detective Sergeant Renz, of the Toledo Police Department, testified she is the head of the Scientific Investigations Unit ("SIU"). She was called on January 18, 2018, to supervise the scene at Moody Manor. When she arrived, she was told the suspect had blood on him, which needed to be documented. Sergeant Renz volunteered to photograph the suspect, so she went to the Safety Building. The suspect was appellant.

{¶ 29} The sergeant took an overall photograph of appellant, then a close-up picture of his face, as appellant said he had blood in his nose because he was hit with brass knuckles. The picture shows a small cut above appellant's nose, on his nostril. Sergeant Renz also photographed appellant's hands and swabbed them for blood. After appellant used the restroom and presumably washed his hands, photographs were taken which show small cuts on the pinky finger and index finger of his right hand, and some swelling. The sergeant also took a buccal swab of appellant to obtain a DNA sample. The photographs were taken at about 3:20 a.m.

10.

**Terry Cousino**

{¶ 30} Detective Cousino of the Toledo Police Department, SIU, testified he was on duty on January 18, 2018, when he received a call at maybe 1:15 to 1:30 a.m., that a person was shot at Moody Manor. When he arrived there, he was notified by an officer that a bullet had come through the ceiling of apartment 213, about six feet from the front door. The detective documented it, then tried to trace the bullet but discovered it was in the floor of apartment 213 and not recoverable. He was able to find the corresponding hole in the floor of apartment 313, about six feet back from the doorway. The angle of the bullet appeared to be straight down.

{¶ 31} When Detective Cousino first reached apartment 313, the door was ajar and he was advised by officers that the decedent's body was on the other side of the door, which did not allow the door to open all of the way. He noticed broken mirror glass on the outside of the door and a bullet hole through the door, from inside to outside, where the bullet crossed the hallway and went into the opposite wall. The bullet hole was about five feet, four inches up from the floor. The detective tried to recover the bullet, but it went into a metal cable tract, fell down and could not be located.

{¶ 32} Inside of the apartment, Detective Cousino observed signs of a pretty violent struggle, including a couple of broken mirrors, furniture knocked over, a vacuum knocked over, projected and contact bloodstains on the wall and two holes in the wall. The detective viewed the decedent's body just inside of the door, he was on his back, his head was in the corner and his hips were slightly twisted to the left.

11.

{¶ 33} The detective took photographs of apartment 313 and recovered two spent bullets, one was on a green ball cap, which was on the floor next to the decedent, and the other bullet was on the floor under the bathroom door. The detective recovered the ball cap, a pair of eyeglasses, a lighter, and a napkin or paper towel with blood wiped on it. He did not recover a firearm despite searching the apartment pretty thoroughly with two other officers, and looking outside of the window, in the snow.

{¶ 34} Detective Cousino took pictures of the decedent, including his right hand with transfer blood on it, and bullet wounds to the right side of his chest and the center of his chest. He also took photographs of the decedent's jacket with two bullet holes and what appeared to be possible gunpowder.

### Maneesha Pandey, M.D.

{¶ 35} Dr. Pandey, a deputy coroner and forensic pathologist working for the Lucas County Coroner's Office, testified that she conducted the autopsy of Larry Pendleton's body. She observed bloody clothes, and after removing the clothing, she saw multiple gunshot wounds on the body. She photographed the clothing and noted defects in all of the layers of clothing, which corresponded with the entrance and exit wounds on the body. She did not notice any gunshot powder burns or gunpowder residue.

{¶ 36} Dr. Pandey testified there were four gunshot wound entrances: one on the right shoulder, which exited the right upper back; one to the mid-chest, which went through the ribs, thoracic aorta, lungs and came out of the mid-back; one to the right lateral chest, which went through the right lung and ribs then exited; and one to the right

12.

lower back, which went through the abdominal cavity and embedded in the spinal column, perhaps causing paralysis.  All of the gunshots wounds were towards the right side of the body, going right to left, and the wounds to the front of the body were in a downward direction.

{¶ 37} Dr. Pandey testified the decedent had injuries to his face and both hands, but she was unable to determine if they were recent wounds.  There were abrasions and bruises to his left eye and eyebrow region and left cheek, a deep cut to the left lip area; and abrasions, scrapes and bruising to both hands with small cuts around the knuckle area.  The facial injuries were consistent with being punched on the left side of his face.

{¶ 38} The results of the toxicology report indicated the decedent had high levels of alcohol, and the presence of marijuana in his urine.  Dr. Pandey opined the cause of death was multiple gunshot wounds, and she further opined they were of indeterminate range, which means she was not able to determine the distance of the muzzle of the gun to the body, but it was more than two feet.  Although the decedent was wearing a heavy winter coat, a sweatshirt, a shirt and an undershirt, these multiple layers of clothing do not change her opinion as to the range of the shooting; it was not a close range shooting.

**Timothy Augsback**

{¶ 39} Mr. Augsback testified he is a forensic scientist for the Ohio Bureau of Criminal Investigation ("BCI") in the DNA section.  Augsback stated the DNA profiles on the brass knuckles were a mixture, with the decedent included as a major contributor and appellant excluded as a contributor.  Concerning the firearm and live cartridges,

13.

Augsback testified the DNA profiles were not suitable for comparison, as there was not enough high quality or quantity of DNA to make comparisons to known individuals.

**Jameica Russell**

{¶ 40} Ms. Russell testified her nickname is Peaches and she was Rocky's girlfriend. She lived with Rocky in Moody Manor on January 18, 2018, and she knew Tyrone, Myisha and appellant from the complex. Peaches never dated appellant. Peaches saw Rocky with a gun months before his death, but they had an agreement that he would not have a gun at the apartment, because they would be evicted from Moody Manor. Peaches never saw Rocky with a gun at their apartment.

{¶ 41} On January 17, 2018, Peaches went to sleep at about 6:50 p.m., and was awakened around 1:00 a.m. on January 18, 2018, by a banging at her door. She answered the door and Myisha was there, crying and screaming. Myisha was on her phone with the police and yelled at Peaches that Rocky was shot and James shot him. Peaches did not know who James was, as she knew appellant by the name Lavelle. Peaches said Myisha did not have a weapon.

{¶ 42} Peaches left her apartment but could not go up to appellant's apartment to see Rocky, as the police were already there and led everyone out of the building. While Peaches was standing on the sidewalk, she saw appellant being led out of the building in handcuffs. Appellant looked at her and said, "[S]orry, Peaches, he had to go."

{¶ 43} Peaches spoke with a detective and gave a statement. She said she did not know Tyrone personally, but knew he was sneaky and a drug dealer. Peaches said Rocky

14.

was not violent or aggressive when he drank, but he would argue. She did admit she had called the police on Rocky in the past.

**Jeffery Jackson**

{¶ 44} Detective Jackson of the Toledo Police Department, SIU, testified that on January 18, 2018, he attended the autopsy of Larry Pendleton, took photographs and received items of evidence. The detective took swabs from the decedent's hands and Dr. Pandey collected fingernail clippings. The doctor also recovered a bullet. All of the decedent's clothes, the swabs, the clippings and the bullet were collected as evidence.

{¶ 45} On February 27, 2018, Detective Jackson assisted Detective Jeff Clark in conducting a search of appellant's apartment, pursuant to a search warrant, for the firearm used in the crime. They focused their search on the utility closet, which was next to the linen closets. Detective Jackson noticed that both closet doors were open and a box filter that fits up into the furnace was open and partially pulled down out of its compartment. The area, which was very dirty, was dusted for fingerprints, but either none were found or the ridge detail was insufficient. The detective also took photographs. No firearm was found in appellant's apartment.

{¶ 46} On March 8, 2018, Detective Jackson was advised that the decedent's apartment, number 112, at Moody Manor was being cleaned out by maintenance workers and a gun was found. The detective went to Moody Manor, apartment 112, took photographs and collected the firearm, which was a Taurus 38 Special Revolver, along with five unfired Winchester 38 Special cartridges.

**Kevin Kramer**

{¶ 47} Mr. Kramer testified he is a forensic scientist for BCI in the firearms section. Toledo police provided him with a Taurus gun and a spent bullet for examination; the bullet was consistent with being a 38 caliber.

{¶ 48} Kramer performed a comparison to determine if the Taurus gun fired the spent bullet, but the results were inconclusive. He authored a report, dated April 19, 2018, with his findings.

**Crystal Robinson**

{¶ 49} Crystal testified she lived at Moody Manor, in apartment 111, and although she did not know Rocky, she saw him coming and going and she spoke to him. Early in the morning on January 18, 2018, she was on the phone and watching television when she heard two or three gunshots, which startled her. Crystal got off of the phone and crawled into her kitchen.

{¶ 50} Crystal heard people running down the stairs, so she opened her front door to see who was outside. She heard Isha (Myisha Neal) say something about, "[H]e shot him." Crystal knew Myisha from around the neighborhood and apartments. Crystal described Myisha as really nervous, so Crystal asked Myisha into her apartment. Myisha went into Crystal's apartment to wait for the police. Crystal said Myisha only had a cell phone with her, no weapons. Myisha remained in Crystal's apartment the entire time until the police arrived.

16.

**Tonya Brown**

{¶ 51} Tonya testified she was Rocky's older sister. She and Rocky were born in Alabama, and moved to Toledo when they were in elementary school. They also have a younger sister and Rocky had a daughter. Tonya described her brother as sweet, helpful to elderly neighbors, he liked to laugh and have fun and he liked to be with family. Rocky was very athletic, played football and was all-state running back in high school. Rocky went to Penta and got a degree for auto body and collision, and wanted to open his own shop. He worked in manufacturing, but had to resign for medical reasons. Tonya recalled that about seven years ago, Rocky started to have seizures and a noncancerous mass was found in his brain, and removed.

**Jeff Clark**

{¶ 52} Officer Clark, of the Toledo Police Department, testified he was the on-call investigator on January 18, 2018, when he was notified of a homicide at Moody Manor. He arrived at Moody Manor and was briefed by several officers including his supervisor and Detective Renz. Initially, he did not interview any witnesses. The officer left the scene, went to the Safety Building, and he and Detective Hahn interviewed Myisha and Tyrone. Tyrone was not known to be a gangster.

{¶ 53} Several hours later, Officer Clark returned to Moody Manor with a search warrant, so a more extensive search inside and outside of appellant's apartment could be undertaken. The officer and Detective Hahn searched the utility closet where the furnace was located, but it was a tight, confined space, and they were not able to get behind the

17.

furnace although they tried to look around and underneath the furnace. No weapon or spent shell casings were found in or around appellant's apartment. Officer Clark also interviewed Peaches while at Moody Manor. After that interview, he returned to the Safety Building to interview appellant.

{¶ 54} Officer Clark and Detective Hahn interviewed appellant at about 5:00 to 5:45 a.m. Appellant was advised of his rights. During the videotaped interview, the officer was made aware that appellant had been drinking earlier and smoking marijuana. Appellant drank two and one-half twenty-four ounce cans of Milwaukee Ice beer, drinking the last beer around 11:30 p.m. Appellant did not appear to be intoxicated and his responses to the officer were appropriate. Appellant's account of what transpired was not consistent with Myisha's account. Appellant indicated that Rocky had the brass knuckles, and appellant was able to gain control of them and use them on Rocky. Appellant had the brass knuckles in his pant's pocket when police arrived at Moody Manor.

{¶ 55} During the course of the investigation, Officer Clark learned that after the shooting, Tyrone had been searched by police and no weapon was located on him. In addition, there was no mention that Myisha was in possession of a firearm, and Officer Clark confirmed this by tracking Myisha's movements on the surveillance video. The officer also tracked the whereabouts of Tyrone, his girlfriend and appellant on the video.

18.

{¶ 56} Officer Clark testified the theory was that a revolver was used because of the absence of shell casings. When shooting a revolver, for each round fired, the trigger must be pulled.

{¶ 57} Officer Clark listened to some of the jail telephone calls involving appellant, and around February 16, 2018, there were calls that indicated appellant was concerned about getting property out of his apartment. A DVD was made of the pertinent portions of the calls. In one call, appellant, who was talking with his father, said he was going to ask his uncle, Ant, to throw something in the garbage. Appellant said his fate was in Ant's hands. During a call with Ant, appellant said he needs Ant to do him the biggest favor in the world. Appellant then described the linen closet, said turn around, and that is the utility closet with the furnace. In other calls, dirty jeans and a thousand dollars were discussed, which Officer Clark theorized were code for a firearm, as there is no need to secretly remove dirty jeans or refer to money secretively.

{¶ 58} Based on the phone calls, the officer secured and executed a search warrant for appellant's uncle's house and appellant's apartment. The officer searched appellant's apartment with Detective Jackson and found the furnace was not in the same condition as it had been on January 18, 2018. The furnace door was now pulled down and the filter was exposed and damaged.

{¶ 59} Officer Clark also pulled surveillance footage from the exterior of Moody Manor on February 16, 2018, which corresponded with the timing of the phone call regarding removing an object from the furnace, and Ant can be seen coming and going.

19.

The officer had interviewed Ant, so he was able to identify Ant on the video. Plus, during the interview, Ant admitted that he went to the apartment to remove property.

{¶ 60} Officer Clark recovered a Facebook video from appellant's cellphone which shows appellant holding a dark colored revolver. The video was posted August 13, 2017.

{¶ 61} Officer Clark heard Myisha testify at trial and said her testimony was extremely consistent with what she told him on January 18, 2018.

**Appellant**

{¶ 62} Appellant testified he was 23 years old, and lived at Moody Manor 13 years. He was 5'9" and 320, 340 pounds. Appellant knew Rocky and Tyrone, and through them, he met Myisha. He described Rocky as a friend, but he could be argumentative when drinking, Tyrone was a bully, a player and a drug dealer who always carried a gun, and Myisha did not have a job and would "indulge in anything to keep her not sober." Tyrone and Myisha had a relationship and appellant said Myisha really liked Rocky and Rocky told appellant that she was trying to get Rocky to leave Peaches.

{¶ 63} On the night of January 18, 2018, appellant got off of work and was at his apartment, relaxing—drinking a beer, watching television, on the phone. Tyrone stopped by and said he was going to the store, and then he, Rocky and Myisha would probably be back. Later, Tyrone and Rocky came by appellant's apartment, and Rocky sat in the kitchen area. Myisha called Rocky's phone, then she arrived at the apartment about five minutes later. The group partied.

20.

{¶ 64} Appellant testified Rocky drove him to the store so appellant could get more beer and cigarettes. In the car, they talked about Myisha and Rocky asked appellant about his job and the money appellant owed him. Appellant explained "we had like a barter system and things. I owed him like $146 * * * I told him * * * I can't pay you right now, I have other bills to tend to * * * I catch you my next check." Appellant said he went into the store while Rocky waited in the car. He bought beer and cigarettes and paid his cell phone bill. Rocky and appellant then went back to the apartment, where they joined Tyrone and Myisha. Everyone was relaxing.

{¶ 65} Appellant recalled Rocky asked if he and Myisha could use appellant's bedroom, but appellant said no, because he had to go to work in the morning and did not want to stay up late. The festivities continued, with smoking and drinking. Myisha sat on Rocky's lap and Tyrone left "for a split second and he goes downstairs. He comes back with like a big Ziploc bag of weed. Like, I think well over a pound. And he starts to sack stuff out * * * [H]e pulls out a bud and says, here, you guys can smoke." Appellant thought it was good weed, and said he wanted to buy some. Appellant "put out a couple twenties, knowing it was food money and everything * * * That's when Rocky started to get kind of - - he stood up and started pacing and things * * * [Rocky] started getting upset a little bit after I bought the bag of weed from Tyrone."

{¶ 66} Appellant said Rocky started "very aggressive, petty arguments" with him out of nowhere, like "you think you're special [because you got a job now], you told me you couldn't pay me right now, but you buying weed, f*** you trying to play me * * *

I'm not leaving till I get my money." Appellant responded, "[y]ou trippin', man. I'm going to pay you money, you know. But you know I smoke, so of course I buy some weed * * * you kind of need to relax * * * I think you had too much to drink."

{¶ 67} Appellant testified he asked everyone to leave, but Rocky was getting angrier and not leaving. Appellant stated "I knew I was in the wrong for buying weed in front of [Rocky], and he just asked me about the money in the car. So I was just trying, you know, go, you had a little bit too much to drink, just leave. Please leave my house. I kept saying that over and over."

{¶ 68} Appellant testified he started to walk towards Rocky, asking him to leave. Rocky shoved appellant, then Rocky started punching appellant. Appellant fought back, and "[w]e're fighting, tearing up my house. He's falling. I'm actually falling, too, as well because I'm tripping over things that we've knocked over." The fight continued "[Rocky] got up and started punching again and again and again." Appellant was asked if the punches were striking him and he replied, "Majority are, but I'm blocking most of them * * * [b]ut I was also catching him a lot of times, too."

{¶ 69} Appellant said he was winning the fight, but Rocky did not stop. The fight moved from the living room to the hall area, and then Rocky "came back with the punch, he came back with some silver [brass knuckles] on his hand, and he hit me one time in the nose." Appellant blocked the punches, stepped on Rocky's foot and started punching. Rocky fell down and the brass knuckles slipped off of his hand, so appellant picked up the brass knuckles and "placed them in my hand so he couldn't hit me with them no

22.

more." Rocky kept fighting and appellant remembered hitting Rocky with the brass knuckles a couple of times, but then appellant stepped back and put the brass knuckles in his pocket. The men were now in the kitchen fighting. Appellant described the fight as an even exchange, but he was blocking more of the hits than Rocky was.

{¶ 70} Appellant testified he tried to slip past Rocky, but was tripped and landed in front of the door; Rocky followed. Appellant was trying to get Rocky close to the door, so he could open the door and get Rocky out of the apartment, but Rocky was very resistant.

{¶ 71} Appellant said Tyrone then pushed him and Rocky apart. Appellant kept telling Rocky to leave. Rocky "lunged back at [appellant] throwing some more punches, and then all of a sudden I see this gun and it just comes at me." The "gun was like a silverish black, but it was black -- I would say more silver. * * * It appeared to be a revolver." Rocky was pointing the gun at appellant, and the men were about two feet apart, "[s]o essentially I reached and I pried it from his hand. He fired it when I grabbed it, and I believe the shot went down into the floor. * ** I immediately had it in my hand. He was lunging and I fired." Appellant did not know how many times he fired as "I was scared shitless if I may say. I was scared. I just fired."

{¶ 72} After firing, Rocky "took a couple steps back, went to the ground." Rocky said something, moaned several times "and then it was over with." Appellant dropped the gun "and I watched Tyrone come over, kneel down in two areas, and then one area was where initially the gun area, where I'm thinking I dropped it at, and then he taps

23.

Rocky saying * * * you okay, and I saw his hands come up and go back in his pocket, and he used one hand to open the door and leave." Myisha knelt down, attempted to wake Rocky, then she followed behind Tyrone.

{¶ 73} Appellant was in shock. He walked to his chair, sat down and called his father. He noticed Tyrone had left his Ziploc bag of weed, so appellant hid the weed where the furnace was. He went in the bathroom then went back to his chair, noticed a little weed on the table "so I rolled it up, fired it up. It was sloppy, wasn't perfect." Appellant heard footsteps and "someone creeping up to my door, like pushing the door." It was the police with their guns drawn. Appellant said, "I'm not armed. I don't have any weapons. They took the weapons with them."

{¶ 74} When the police were escorting appellant out of the apartment building, he saw Peaches, who was crying hysterically. He thought he said, "[S]orry, Peaches, he made me do it, he had to go." Appellant wanted to stop and explain to Peaches what had happened, how combative Rocky was.

{¶ 75} Appellant went to the police station where he gave a statement. He remembers telling the truth, but he left out details because he was still in shock. He told the police the main part—that Rocky started the fight, things escalated to brass knuckles, Rocky was upset appellant was winning and Rocky pulled a gun.

{¶ 76} Appellant testified he did not hide the gun in the furnace, he wanted the police to find the gun because "[b]oth our fingerprints would have been on it to prove that it was his gun." Appellant told police "I'm not sure who took it, I think it was Isha

24.

[Myisha] * * * they both [Tyrone and Myisha] kneeled down, and when they left, the gun was gone." When appellant was asked "right now do you know who took the gun?" he answered, "I think it was Tyrone." Appellant stated he did not own a gun, but admitted he told the detectives that he had owned guns before because he had been jumped.

{¶ 77} Appellant said he called his uncle to get the weed that was hidden in the furnace because he knew it would start to smell. Appellant had to make it sound kind of serious so his uncle would go to the apartment as "[t]hey were basically telling me, you know, your stuff is garbage, don't worry about it." Appellant asked his uncle if he got it, and the uncle said "yes, sir, you a smart man, I love you for that, that's good shit." Appellant explained his uncle was talking about the weed being good, and he was happy appellant trusted him.

{¶ 78} On cross-examination, appellant admitted mentioning for the first time at trial that: he owed Rocky $146; Tyrone brought a pound of weed up to the apartment; he wrestled the gun away from Rocky and Rocky fired the first shot; he hid something in the furnace; and the gun belonged to Tyrone.

{¶ 79} Appellant said the majority of Myisha's testimony was not truthful, although he then acknowledged that he did agree with many of her statements. Appellant testified he told the police what happened was self-defense, that he protected himself. Appellant stated the gun in the Facebook video was not his gun, he was with other people, and the gun was passed to him in a careless moment, showing off.

25.

**First Assignment of Error**

{¶ 80} Appellant argues the trial court abused its discretion in denying his request for a jury instruction on voluntary manslaughter. He contends he requested jury instructions for voluntary manslaughter and self-defense, but the court refused to give a voluntary manslaughter instruction if appellant wanted a self-defense instruction. Appellant asserts the court denied the voluntary manslaughter instruction without inquiring whether appellant had been provoked by Rocky to act with sudden passion or in a fit of rage.

**Standard**

{¶ 81} On appeal, we review a trial court's decision refusing to give a requested jury instruction for abuse of discretion. *State v. Wolons*, 44 Ohio St.3d 64, 68, 541 N.E.2d 443 (1989). An abuse of discretion indicates that the trial court was unreasonable, arbitrary, or unconscionable in its ruling. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219, 450 N.E.2d 1140 (1983).

**Law**

{¶ 82} Appellant was charged with and convicted of murder, in violation of R.C. 2903.02, which provides:

(A) No person shall purposely cause the death of another * * *.

(B) No person shall cause the death of another as a proximate result

of the offender's committing or attempting to commit an offense of

violence that is a felony of the first or second degree and that is not a violation of section 2903.03 or 2903.04 of the Revised Code.

(C) Division (B) of this section does not apply to an offense that becomes a felony of the first or second degree only if the offender previously has been convicted of that offense or another specified offense.

{¶ 83} Voluntary manslaughter is an inferior degree offense of murder.  *See State v. Shane*, 63 Ohio St.3d 630, 632, 590 N.E.2d 272 (1992).  The voluntary manslaughter statute, R.C. 2903.03, provides:

No person, while under the influence of sudden passion or in a sudden fit of rage, either of which is brought on by serious provocation occasioned by the decedent that is reasonably sufficient to incite the person into using deadly force, shall knowingly cause the death of another * * *.

{¶ 84} The legal test for voluntary manslaughter is set forth in *State v. Thompson*, 141 Ohio St.3d 254, 2014-Ohio-4751, 23 N.E.3d 1096, which includes both an objective and a subjective component ("*Thompson* test").  The *Thompson* test is used in murder cases in order to determine whether the defendant is entitled to an instruction on voluntary manslaughter.  *Id.* at ¶ 152; *Shane* at paragraph one of the syllabus.  "First - the objective factor - the fact-finder must determine whether a serious provocation [caused by the decedent] occurred and whether that provocation was 'sufficient to arouse the passions of an ordinary person beyond the power of his or her control.'"  *Thompson* at ¶ 153, quoting *Shane* at 635.  If the objective component is satisfied, the inquiry shifts to

27.

the subjective factor where "the fact-finder must evaluate whether 'this actor, in this particular case, actually was under the influence of sudden passion or in a sudden fit of rage.'" *Thompson* at ¶ 153, quoting *Shane* at 634.

{¶ 85} Evidence that the defendant feared for his own safety and used deadly force (self-defense), does not constitute sudden passion or a fit of rage as contemplated by the voluntary manslaughter statute. *See State v. Harris*, 129 Ohio App.3d 527, 535, 718 N.E.2d 488 (10th Dist.1998). "Self-defense on the one hand requires a showing of fear, whereas voluntary manslaughter requires rage." *State v. Thompson*, 10th Dist. Franklin No. 92AP-1124, 1993 WL 51114 (Feb. 23, 1993), *2.

### Analysis

{¶ 86} Upon review, the record shows the trial court did not apply the *Thompson* test prior to deciding not to instruct the jury on voluntary manslaughter. Nonetheless, we find the trial court's error was harmless for the reasons that follow.

{¶ 87} Applying the objective factor of the *Thompson* test to the evidence presented at trial, we find a reasonable person could conclude, based on appellant's testimony, that a serious provocation was caused by Rocky, and this provocation was objectively sufficient to incite a sudden fit of rage in an ordinary person beyond the person's power to control.

{¶ 88} Concerning the subjective factor of the *Thompson* test, we find the record contains no evidence that appellant was under the influence of sudden passion or rage when he used deadly force. Appellant testified he was scared and was protecting himself

28.

when he shot Rocky. Since the subjective component of the *Thompson* test was not satisfied, appellant was not entitled to a jury instruction on voluntary manslaughter. As such, appellant was not harmed by the trial court's failure to apply the proper law when it determined a voluntary manslaughter instruction was not warranted. Finding no abuse of discretion, appellant's first assignment of error is not well-taken.

## Second Assignment of Error

{¶ 89} Appellant argues the verdict was against the manifest weight of the evidence, as the jury lost its way in convicting him of murder. Appellant maintains he met the requirements of proving self-defense by a preponderance of the evidence. He asserts there was evidence that Rocky was the initial aggressor, Rocky produced brass knuckles and the gun, appellant was injured, appellant believed he was in immediate danger of losing his life, and appellant was in his own apartment and had no duty to retreat.

## Standard

{¶ 90} In a manifest weight challenge, we determine whether the greater amount of credible evidence supports the conviction. *Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, 972 N.E.2d 517, ¶ 12. We must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of the witnesses and determine whether the jury, in resolving conflicts in the evidence, "'clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed

29.

and a new trial ordered.'" (Citation omitted.) *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997).

{¶ 91} When we consider witness credibility, we must remember "the choice between credible witnesses and their conflicting testimony rests solely with the finder of fact and an appellate court may not substitute its own judgment." *State v. Awan*, 22 Ohio St.3d 120, 123, 489 N.E.2d 277 (1986). The jury is "in the best position to observe the evidence presented, the witnesses' testimony, including their demeanor, voice inflection, and mannerisms, in order to determine the credibility of each witness." *State v. Saunders*, 10th Dist. Franklin No. 99AP-1486, 2000 WL 1724823, *3 (Nov. 21, 2000).

## Law

{¶ 92} To establish self-defense, "the defendant must prove: (1) he was not at fault in creating the situation giving rise to the affray; (2) he had a bona fide belief he was in imminent danger of death or great bodily harm and that his only means of escape from such danger was the use of deadly force; and (3) he did not violate any duty to retreat or avoid the danger." *State v. Robbins*, 58 Ohio St.2d 74, 388 N.E.2d 755 (1979), paragraph two of the syllabus. "If the defendant fails to prove any one of these elements by a preponderance of the evidence he has failed to demonstrate that he acted in self-defense." *State v. Jackson*, 22 Ohio St.3d 281, 284, 490 N.E.2d 893 (1986).

## Analysis

{¶ 93} Upon review, we cannot find that the jury clearly lost its way in rejecting appellant's claim that he acted in self-defense. The jury was required to assess the

30.

credibility of all of the witnesses, weigh the evidence and determine which version of events it believed. The testimony of Myisha Neal, detectives and police officers, as well as appellant's jail phone calls and videotaped statement, surveillance tapes from Moody Manor and photographs of appellant's apartment, provided competent, credible evidence upon which the jury could conclude appellant failed to prove by a preponderance of the evidence that he acted in self-defense when he shot and killed Rocky.

{¶ 94} The record shows evidence was presented from which the jury could decide that appellant instigated the fight with Rocky, appellant was not in imminent danger and had means to escape other than by shooting Rocky, and appellant could have retreated to avoid danger. Thus, the jury's conclusion that appellant did not act in self-defense is not against the manifest weight of the evidence. Furthermore, we find the jury's guilty verdicts on the murder charges and firearm specifications are not against the manifest weight of the evidence. Accordingly, appellant's second assignment of error is not well-taken.

{¶ 95} The judgment of the Lucas County Court of Common Pleas is affirmed. Appellant is ordered to pay the costs of this appeal, pursuant to App.R. 24.

Judgment affirmed.

31.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.


Mark L. Pietrykowski, J.                                      _____

                                                               JUDGE

Arlene Singer, J.

                                      _____

Christine E. Mayle, J.                                     JUDGE
CONCUR.

                                        _____
                                              JUDGE

This decision is subject to further editing by the Supreme Court of Ohio's Reporter of Decisions. Parties interested in viewing the final reported version are advised to visit the Ohio Supreme Court's web site at: http://www.supremecourt.ohio.gov/ROD/docs/.